IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ACI CONSTRUCTION, LLC,<br><br>  Plaintiff,<br>v.<br><br>UNITED STATES OF AMERICA,<br><br>  Defendant,<br><br>UNITED STATES OF AMERICA,<br><br>  Counterclaim Plaintiff,<br>v.<br><br>ACI CONSTRUCTION, LLC and SID CROOKSTON, LLC,<br><br>  Counterclaim Defendants. | **MEMORADUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br><br>Case No. 1:19-cv-00054-JNP-JCB<br><br>District Judge Jill N. Parrish |

  ACI Construction, LLC ("ACI") sued the United States to quiet title to real and personal property on which the United States filed a lien. ECF No. 2. The United States subsequently filed two counterclaims, including a counterclaim against ACI to obtain a determination that ACI is liable for the federal tax and related assessments and penalties as a successor-in-interest to Sid Crookston, LLC ("SCC"). *See* ECF No. 20. Before the court is ACI's motion for summary judgment on both its quiet title claim against the United States and the United States's counterclaim against ACI. ECF No. 83. For the reasons presented herein, the court DENIES ACI's motion for summary judgment.

1

## BACKGROUND[1]

In the mid-1990s, Sid Crookston ("Sid") formed Sid Crookston Construction,[2] which specialized in "preparing raw land for subdivisions by cutting roads, installing sidewalks, utilities and the like." ECF No. 83 at 2. Although Sid eventually became the sole owner of SCC, SCC was a family affair. Sid's sons and stepson—Chris Crookston, Aldon Crookston, and Bronson Twitchell—worked at SCC and eventually served in leadership roles with the company, such as project foreman.

SCC had some success as a business, but it faced mounting financial problems by the early part of 2016. Sid and SCC had been sued or threatened with suit over at least three projects, and "SCC had racked up over $1.4 million in delinquent federal taxes over the course of 7 years." ECF No. 87 at 2. As a result, SCC shut down in approximately July 2016.

Around this same time, Chris Crookston, Aldon Crookston, and Bronson Twitchell formed ACI, which specialized in the same type of work as SCC. ACI took possession of SCC's equipment, email address, and physical location, and at least twenty-two of ACI's twenty-six employees transitioned from SCC. In addition, upon SCC's shut down, ACI retained SCC customers and ongoing projects. In one instance, Sid informed an SCC customer that now the customer "would be working with ACI Construction instead of Sid Crookston Construction, and that all future checks should be made payable to ACI Construction." ECF No. 88-63 ¶ 12. ACI also assumed at least some of SCC's obligations, such as SCC's obligation to purchase aggregate products from Pisgah Stone Products pursuant to the terms of a settlement agreement between

---

[1] The court recites the facts in the light most favorable to the nonmoving party, the United States.
[2] Sid Crookston Construction is also known as Sid Crookston, LLC.

2

SCC and Pisgah Resources, LLC. When asked about ACI, Julie Crookston, Sid's wife, responded, "That's what the company goes by now." ECF No. 88-37.

Although Sid was not a formal owner of ACI and did not become formally employed by ACI until 2017, he acted as a supervisor on ACI projects as soon as ACI began operations in July 2016. In addition, ACI employees believed that Sid was in charge of ACI, and Sid represented ACI in meetings and communications with customers and made decisions on behalf of ACI.

On May 22, 2018, the United States filed a lien against all property and rights to property belonging to ACI. The United States claimed that ACI was liable for SCC's outstanding tax payments as SCC's successor-in-interest. In response, ACI sued the United States to quiet title to the real and personal property on which the United States filed its lien. The United States subsequently filed a counterclaim against ACI, seeking a determination that ACI is liable for the federal tax and related assessments and penalties as a successor-in-interest to SCC.

ACI now moves for summary judgment on its quiet title claim and the United States's counterclaim, arguing that, as a matter of law, it is not a successor-in-interest to SCC and, consequently, it is not responsible for SCC's outstanding tax liabilities.

**LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "A dispute over a material fact is genuine if a rational [fact-finder] could find in favor of

the nonmoving party on the evidence presented." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (citation omitted).

"At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). Rather, the court must "construe the evidence in the light most favorable to . . . the nonmoving party." *Est. of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (citation omitted). However, summary judgment on a claim is required if the party that bears the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

## ANALYSIS[3]

ACI moves for summary judgment on its quiet title claim against the United States, as well as the United States's counterclaim against ACI asserting that ACI is liable for the unpaid taxes of SCC. For both claims, the critical issue at this stage is whether the United States has produced sufficient evidence that, under Utah law, ACI is the successor-in-interest to SCC to preclude summary judgment. *See TFT Galveston Portfolio, Ltd. v. Comm'r*, 144 T.C. 96, 112 (2015) ("Successor liability is generally determined by State law." (citing *LiButti v. United States*, 178 F.3d 114, 124 (2d Cir. 1999))).

Under Utah law,

> [t]he rule for a claim based on successor liability is that where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor, except where: (1) the purchaser expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation

---

[3] In its reply brief, ACI objects to various exhibits that the United States cites in its opposition to ACI's motion for summary judgment. Because the court does not rely on any of those exhibits in denying ACI's motion for summary judgment, the court need not—and does not—resolve those evidentiary objections here.

> is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently in order to escape liability for such debts.

*Macris & Assocs. v. Neways, Inc.*, 986 P.2d 748, 752 (Utah Ct. App. 1999). ACI argues that it is entitled to summary judgment because, as a threshold matter, ACI never acquired all of the assets of SCC. ACI further argues that, even if the court were to find sufficient evidence that ACI acquired all of SCC's assets, there is no evidence to support a finding that "any of the four 'successor in interest' exceptions to the general rule of non-liability" applies here. ECF No. 83 at 8. The court addresses the parties' arguments regarding each issue in turn.

**I.      SCC's Transfer of its Assets to ACI**

ACI argues that it "cannot be a 'successor in interest' to SCC" because SCC never transferred all or substantially all of its assets to ACI. *See id.* at 8–9. Specifically, ACI contends that SCC "owned a number of construction machines and vehicles, encumbered by bank loans from Cache Valley Bank," and that "SCC still owns those assets to this very day, and they are still encumbered by the Bank loans and potentially the tax liabilities." *Id.* at 9. Thus, according to ACI, "[t]he lack of a threshold transaction [transferring the construction equipment to ACI] ends the inquiry into 'successor in interest' liability." *Id.*

The United States responds that there is a genuine dispute of material fact regarding whether SCC transferred all or substantially all of its assets to ACI. The United States first asserts that "[a] transfer need not be a formal transaction, such as a sale"; rather, "[t]he bottom-line inquiry is whether one company ended up with the assets of another." ECF No. 87 at 23. The United States further asserts that "it is apparent that all or the bulk of SCC's assets wound up in ACI's hands." *Id.* Specifically, according to the United States, after SCC shut down, "ACI promptly started using [SCC's] equipment and took over its customers, employees, and ongoing projects," and "ACI benefited immensely from SCC's goodwill," which ACI used to earn sales and loans. *Id.* at 23–24.

5

The United States contends that, as a result, "notwithstanding the absence of a formal transaction or paperwork, multiple facts point to a transfer of assets from SCC to ACI, or at a minimum, a genuine dispute over whether such a transfer occurred." *Id.* at 24. The court agrees.

As an initial matter, "under Utah law, the sale or transfer of *all* assets is not an absolute prerequisite to a finding of successor liability." *Vivint, Inc. v. Northstar Alarm Servs.*, No. 2:16-cv-00106-JNP-EFJ, 2017 U.S. Dist. LEXIS 130045, at *7–8 (D. Utah Aug. 14, 2017). Rather, only the acquisition of "substantially all" of the assets is required for successor liability to attach. *See id.* at *7 (citing *Tabor v. Metal Ware Corp.*, 168 P.3d 814, 816–17 (Utah 2007) and *True-Flo Mech. Sys., Inc. v. Bd. of Rev. of the Indus. Comm'n of Utah*, 743 P.2d 1161, 1163 (Utah 1987)). Moreover, under Utah law, transfer has a very broad definition. *See, e.g.*, UTAH CODE § 25-6-2(12).[4] Specifically, in the context of Utah's fraudulent transfer law, "transfer" is defined as "every mode, direct or indirect, absolute or conditional, or voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance."[5] *Id.*; *see also Transfer*, *Black's Law Dictionary* (11th ed. 2019) (defining "transfer" as "[a]ny mode of disposing of or parting with an asset or an interest in an asset, including a gift, the payment of money, release, lease, or creation of a lien or other

---

[4] The cited provision is the one that was operative at the time that SCC allegedly transferred its assets to ACI. The provision is now codified at Utah Code § 25-6-102(16).

[5] ACI asserts that Utah Code § 25-6-302(1) further clarifies the definition of "transfer" by providing that "a transfer is made . . . when the transfer is so far perfected that a creditor on a simple contract cannot acquire a judicial lien other than under this chapter that is superior to the interest of the transferee." However, upon close inspection of the statute, it appears that § 25-6-302 is simply a timing provision that addresses when the remedies of the Uniform Voidable Transactions Act become available to a creditor. *See* UTAH CODE § 25-6-303 ("Remedies of creditors"). The definition of "transfer" provided in the main text—and included in the "[d]efinitions" section of the Uniform Voidable Transactions Act, UTAH CODE § 25-6-102(16)—is more consistent with the general definition of "transfer" under Utah law, including in the context of successor-in-interest liability.

encumbrance"); *High Desert Recovery, LLC v. N.M. Taxation & Revenue Dep't*, No. A-1-CA-37852, 2021 N.M. App. LEXIS 65, at *11 (N.M. Ct. App. Dec. 6, 2021) (concluding that, in a successor in business analysis, taking possession of property constituted a transfer of the property, even though "there was no formal transfer of assets"). Here, the court concludes that the United States has presented sufficient evidence to create a genuine dispute regarding whether SCC transferred all or substantially all of its assets to ACI.

Specifically, the United States has produced evidence that SCC transferred all or substantially all of its equipment, employees, customers, ongoing projects, and good will to ACI when SCC terminated its operations. In particular, the United States has produced evidence that, upon SCC's termination, ACI took possession of SCC's equipment. *See* ECF No. 84-8 at 188:9–189:10, 189:18–190:1 ("[Cache Valley Bank] learned—probably learned where the equipment was and found out that ACI was wanting to take possession and make payment to us. And, in fact, they were in possession of it when [Cache Valley Bank] found out where it was."); *see also In re Castle Serv., LLC*, 560 B.R. 587, 591 (Bankr. D. Utah 2016) (explaining that, in the context of the Bankruptcy Code, a possessory interest—which exists when "the debtor has some *right* to possess the property, for example, by virtue of the title holder's consent or permission"—is a property interest); *In re Aponte*, 82 B.R. 738, 743 n.9 (Bankr. E.D. Pa. 1988) ("A tenancy or bare possessory interest in property is a legal or equitable interest constituting property of the estate."). Viewing the evidence in the light most favorable to the United States, *see Est. of Booker*, 745 F.3d at 411, a reasonable inference is that, directly or indirectly, SCC parted with or disposed of its equipment and permitted ACI to obtain possession of the equipment (i.e., SCC "transferred" the equipment to ACI, *see* UTAH CODE § 25-6-2(12)). The United States also has produced evidence that SCC informed its insurance providers that, on July 2, 2016, it transferred physical assets to ACI. *See*

7

ECF No. 88-52.[6] Moreover, the United States has produced evidence that, on July 15, 2016, twenty-two of ACI's twenty-six employees had been employees of SCC on June 30, 2016. *Compare* ECF No. 88-30 *with* ECF No. 88-31.

In addition, the United States has produced evidence that, upon SCC's shut down, SCC's customers and ongoing projects were transferred to ACI. *See* ECF Nos. 88-15; 88-38; 88-62 ¶¶ 12, 40; 88-63 ¶¶ 5, 12; 88-64 ¶¶ 9, 12. For instance, Stan Checketts testified that he thought he hired SCC "to work on the Little Baldy project in Providence, Utah." ECF No. 88-63 ¶ 5. However, "[a]t some point just before or during the Little Baldy project, Sid Crookston informed [him] that [he] would be working with ACI Construction instead of Sid Crookston Construction, and that all future checks should be made payable to ACI Construction." *Id.* ¶ 12.

The United States has also produced evidence that SCC transferred its email address, *see* ECF Nos. 88-16 ¶ 31; 88-19, and physical location, *see* ECF No. 88-62 ¶ 47, to ACI, and that ACI benefitted from SCC's good will, *see* ECF No. 88-7. Therefore, there is ample evidence from which a reasonable fact-finder could conclude that SCC transferred all or substantially all of its assets to ACI. Accordingly, there is a genuine dispute regarding ACI's acquisition of SCC's assets.

---

[6] ACI contends that, under Utah Code § 25-6-102(2), the equipment at issue is "not an 'asset' at all, because it was fully encumbered by the bank lien." ECF No. 99 at 4. Assuming, for the sake of argument, that ACI is correct that, as a result, the equipment is not an asset for purposes of the successor-in-interest analysis, then the equipment should be entirely excluded and not considered in that analysis. Under such circumstances, the court would still conclude that the United States has produced sufficient evidence that SCC transferred all or substantially all of its assets to ACI to defeat summary judgment, based simply on the evidence that SCC transferred its ongoing projects and good will to ACI. *See Bagford v. Ephraim City*, 904 P.2d 1095, 1098–99 (Utah 1995) ("[A] contract is property." (quoting *Long Island Water Supply Co. v. City of Brooklyn*, 166 U.S. 685, 690 (1897))); *Jackson v. Caldwell*, 415 P.2d 667, 670 (Utah 1966) ("Good will is property, so recognized and protected by law."); *see also* UTAH CODE § 25-6-102(2) ("'Asset' means property of a debtor, but does not include: (a) property to the extent it is encumbered by a valid lien" and two other exceptions).

**II.     Exceptions to Successor Nonliability**

Even though there is evidence from which a reasonable fact-finder could conclude that SCC transferred all or substantially all of its assets to ACI, "[t]he general rule is that where one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor." *See R.J. Enstrom Corp. v. Interceptor Corp.*, 555 F.2d 277, 281 (10th Cir. 1977) (citation omitted). Rather, a corporation that acquires all or substantially all of another corporation's assets is only liable for the debts and liabilities of the latter corporation if (1) the acquiring corporation "expressly or impliedly agrees to assume such debts"; (2) "the transaction amounts to a consolidation or merger of the corporations"; (3) the acquiring corporation "is merely a continuation of the" transferor; or (4) "the transaction is entered into fraudulently in order to escape liability for such debts." *Id.* at 281–82 (citation omitted). ACI argues that none of the four exceptions applies here and it is consequently not liable for SCC's debts. It therefore seeks summary judgment in its favor. The United States responds that all four exceptions apply here and, therefore, ACI is liable for SCC's debts and liabilities. Because the court concludes that the United States has produced sufficient evidence from which a reasonable fact-finder could determine, at minimum, that the second and third exceptions apply, the court limits its discussion to those exceptions in denying ACI's motion for summary judgment.

   A.     *De Facto Merger Exception*

Courts applying the de facto merger exception look beyond the form of an asset transfer to determine whether there has been, in substance, a merger or consolidation. *See, e.g.*, *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 965 N.Y.S.2d 284, 297 (Sup. Ct. 2013). Whether a de facto merger has occurred generally depends on the presence of the following factors:

> (1) there is a continuation of the enterprise of the [transferor] in terms of continuity of management, personnel, physical location, assets, and operations;

>  (2) there is a continuity of shareholders;
>  (3) the [transferor] cease[s] operations, liquidates, and dissolves as soon as legally and practically possible; and
>  (4) the [acquiring] corporation assumes the obligations of the [transferor] necessary for uninterrupted continuation of business operations.

*Ekotek Site PRP Comm. v. Self*, 948 F. Supp. 994, 1002 (D. Utah 1996) (citation omitted). More succinctly, because "[t]he successor liability doctrine is an equitable doctrine, . . . the Court considers whether the shareholders used a disguised mechanism to transfer the legal ownership of the corporation but ultimately retain the same effective control." *DeJesus v. Bertsch, Inc.*, 898 F. Supp. 2d 353, 362 (D. Mass. 2012), *aff'd sub nom. DeJesus v. Park Corp.*, 530 F. App'x 3 (1st Cir. 2013) (unpublished); *see also Perez v. Paragon Contrs. Corp.*, 340 F. Supp. 3d 1194, 1213 (D. Utah 2018) ("Because the origins of successor liability are equitable, fairness is a prime consideration in its application.").

ACI argues that the de facto merger exception "cannot be met here because one of the requirements of a 'de facto' merger is that the owner of the selling company ends up with an ownership interest in the resulting company" and Sid, the sole owner of SCC, does not have—and never had—an ownership interest in ACI. ECF No. 83 at 3, 10–11. According to ACI, because continuing ownership "is a mandatory element of a 'de facto' merger," the analysis ends right there. *Id.* at 11–13. The United States responds, in part, that even though ACI's "paperwork does not list Sid Crookston as an owner," ownership of SCC and ACI overlapped in practice. ECF No. 87 at 27. Specifically, according to the United States, "[t]he shareholders of both SCC and ACI were Crookston family members" and "Sid Crookston, the owner of SCC, retained control of ACI and was an owner and manager of ACI in practice." *Id.* The United States contends that when the court "look[s] beyond surface level formalities (where ACI directs its attention) to what happened in practice," "ACI emerges as nothing more than a cover story whereby Sid gave up formal

10

ownership of SCC to his sons while keeping himself and the same overall family members in control of the family business." *Id.* at 28–29. The United States further contends that it has produced evidence that establishes the other factors in the de facto merger analysis. The court agrees that, based on the evidence that the United States has produced, a reasonable fact-finder could conclude that there was a de facto merger between SCC and ACI.

First, as discussed previously, the United States has produced evidence that ACI was a continuation of SCC. Specifically, the United States has produced evidence that virtually all of ACI's employees were previously employed by SCC, *see* ECF Nos. 88-30, 88-31, and that ACI retained the physical location, assets, and operations of SCC, *see, e.g.*, ECF Nos. 84-8 at 189:18–190:1; 88-52; 88-15; 88-38; 88-62 ¶ 47. Moreover, ACI does not dispute that SCC ceased operations and liquidated and dissolved as soon as legally and practically possible, *see* ECF No. 83 at 5, and the United States has produced evidence that ACI "assume[d] the obligations of [SCC] necessary for uninterrupted continuation of business operations." *See Ekotek Site*, 948 F. Supp. at 1002 (citation omitted). In particular, the United States has produced evidence that ACI assumed SCC's obligations with respect to equipment rentals, *see* ECF No. 88-11 at 2, fuel, *see* ECF No. 88-13 at 3, Verizon services, *see* ECF No. 88-42, and required purchases of Pisgah Stone Products, *see* ECF No. 88-49 at 8 (explaining that, pursuant to a settlement agreement, SCC "agreed that Pisgah Stone would sell aggregate products to Sid Crookston" and, since that settlement was reached, "ACI regularly purchases aggregate products from Pisgah Stone").

The crux of the dispute is whether the United States can establish continuity of shareholders, even though it is undisputed that, on paper, Sid was the sole owner of SCC and Chris Crookston, Aldon Crookston, and Bronson Twitchell are the owners of ACI. *See* ECF No. 87 at 6. ACI asks the court to take a highly formalistic approach to the question of ownership—that is, to

11

simply compare the nominal owners of the two companies and to conclude, as one must, that there is no overlap in ownership between SCC and ACI. However, even the cases on which ACI relies reject such an approach. Indeed, in *MBIA Ins.*, the court emphasized that New York takes a "broad view" when determining whether a de facto merger has occurred, "analyzing the 'four hallmarks' of de facto merger 'in a flexible manner that disregards mere questions of form and asks whether, in substance, it was the intent of the successor to absorb and continue the operation of the predecessor.'" 965 N.Y.S.2d at 293 (citation omitted). More on point, the court explained that "New York courts have emphasized that '[t]he requirement of ownership continuity does not exalt form over substance.'" *Id.* at 298 (citation omitted). Similarly, in *Lehman Bros. Holdings v. Gateway Funding Diversified Mortgage Services, L.P.*, 989 F. Supp. 2d 411, 434 (E.D. Pa. 2013), the court emphasized that "in deciding whether a *de facto* merger exists, a court is required to 'look beyond the superficial formalities of a transaction in order to examine the transactional realities and their consequences.'" (Citation omitted.) In that case, the court concluded that there was continuity of ownership even though the owners of the predecessor company did not receive shares of the successor company. *Id.* at 434–36; *see also id.* at 433–34 ("[T]he objective of the continuity of ownership requirement is to identify situations in which shareholders of a seller corporation retain an ownership interest in their assets after artificially cleansing those assets of liability and thus unfairly attempt to impose their costs or misdeeds on third parties.").

    Here, the court concludes that the United States has produced evidence from which a reasonable fact-finder could determine that, beneath the superficial formalities, there was continuity of ownership between SCC and ACI. Specifically, the United States has produced evidence that, even though Sid was not a nominal owner of ACI, he exerted significant authority over the company. Specifically, the United States has produced evidence that, although Sid did not

12

become an employee on paper for ACI until 2017, he acted as a supervisor on ACI projects as soon as ACI began operations in July 2016. *See* ECF No. 88-46 at 21, 30. The United States has also produced evidence that Sid Crookston communicated with customers on behalf of ACI and acted as a representative for ACI with decision-making authority. *See* ECF No. 88-62 ¶ 23 ("I created the ACI Construction bid cost summary because at this time I realized that Sid was using or would soon use ACI Construction. Sid Crookston signed the ACI Construction bid cost summary."); *id.* ¶ 34 ("In or around July 2016, I was primarily communicating with Sid. After speaking with Sid, I did not hire another general contractor because I received assurances from Sid that his company could handle the project and not to worry."); *id.* ¶ 39 ("In or around October or November 2016, Chris [Crookston] started stepping in to work more on the Revolve project. Sid informed me that Chris would manage the Revolve project. At this time, I still considered Sid the general contractor for the Revolve project and I primarily communicated with Sid."); *id.* ¶ 48 ("I believed that Sid was running ACI Construction because he continued to make the decisions regarding the Revolve project."); *id.* ¶ 51 ("I went to Sid directly for questions relating to the management of the construction because Sid directed people where to go and what to do onsite."); ECF No. 88-63 ¶ 11 ("Sometime shortly after the Little Baldy project began in November 2016, Sid Crookston informed me that his sons were taking over the business, but he would remain involved. Sid Crookston maintained communication with me to keep me updated on the progress of the project, participated in meetings regarding the project with the City of Providence, and operated the backhoe."); *id.* ¶ 18 ("In meetings and communications with the City of Providence, Sid Crookston and Chris Crookston acted as ACI's representatives. . . . When Chris Crookston was not in attendance, Sid Crookston solely represented ACI Construction at meetings and in its communications with the City of Providence. Sid Crookston seemed to have authority to make

decisions on behalf of ACI Construction."). The United States has produced further evidence that employees believed that Sid was in charge of the business. *See* ECF Nos. 88-33 at 4; 88-35 at 4.

This evidence, coupled with Sid's eventual formal employment with ACI and familial relationship with the nominal owners of ACI, leads to the reasonable inference that Sid had a significant interest in the success and well-being of ACI and was, in substance, an owner of ACI. *See DeJesus*, 898 F. Supp. 2d at 362 ("The successor liability doctrine is an equitable doctrine, and the Court considers whether the shareholders used a disguised mechanism to transfer the legal ownership of the corporation but ultimately retain the same effective control."). Indeed, the fact that there is evidence that Sid's wife, Julie Crookston, received a higher salary than Chris Crookston, Aldon Crookston, and Bronson Twitchell—the nominal owners of ACI—raises the reasonable inference that Sid used ACI as part of a scheme to "artificially cleans[e] [SCC] of liability" while still reaping the benefits of its business. *See Lehman Bros.*, 989 F. Supp. 2d at 434; ECF No. 88-56 at 1, 5, 6, 22. Thus, there is a genuine dispute regarding whether the de facto merger exception applies here.

### B. Mere Continuation Exception

Under Utah law, "the mere continuation exception is limited to situations where the selling and buying corporations are essentially the same entity (i.e., common directors, shareholders, etc.) operating under different names. In fact, the mere continuation exception traditionally requires a continuation of ownership and control." *Decius v. Action Collection Serv.*, 105 P.3d 956, 959 (Utah Ct. App. 2004) (internal alterations, quotation marks, and citations omitted). "The premise underlying the 'mere continuation' exception to the rule against successor liability is that the successor corporation is, in fact, the *same corporate entity* as the predecessor corporation, simply wearing a 'new hat.'" *Hetronic Int'l, Inc. v. Hetronic Germany GmbH*, 10 F.4th 1016, 1028 (10th

Cir. 2021) (citation omitted). ACI argues that the mere continuation exception "cannot be met here because it also requires an identity of ownership and management" and "[t]he officers and owners of SCC do not own or control ACI, and the officers and owners of ACI did not own or control SCC." ECF No. 83. The United States responds that there are "ample facts showing that ACI is merely a new hat for SCC," with "ACI pick[ing] up where SCC left off, with the same universe of people in control—Sid Crookston and his sons." ECF No. 87 at 29. The United States further contends that "[t]hey were the shareholders and officers of SCC and ACI; the only difference is who the owners were on paper." *Id.* The court agrees with the United States that there is a genuine dispute regarding whether the mere continuation exception applies here.

As discussed previously, the United States has produced evidence that, viewed in the light most favorable to the United States, *see Est. of Booker*, 745 F.3d at 411, raises the reasonable inference that Sid was, in practice, an owner and manager of ACI after SCC shut down. *See, e.g.*, ECF Nos. 88-33 at 4; 88-35 at 4; 88-46 at 21, 30; 88-62 ¶¶ 23, 34, 39, 48, 51; 88-63 ¶¶ 11, 18. Moreover, given Chris Crookston's, Aldon Crookston's, and Bronson Twitchell's roles with SCC and familial relationship with Sid, a reasonable inference is that the nominal owners of ACI also had a vested interest in the success of SCC, as well as some level of control over that company. *See, e.g.*, ECF Nos. 84-5 at 86:18–21; 88-30; 88-31. This evidence of "a continuation of ownership and control," *see Decius*, 105 P.3d at 959, coupled with the evidence presented earlier that ACI retained the employees, assets, customers, email address, physical location, operations, and obligations of SCC, raises the reasonable inference that ACI is the same corporate entity as SCC, "simply wearing a 'new hat,'" *see Hetronic, Int'l*, 10 F.4th at 1028 (citation omitted). Indeed, the United States has produced evidence that, when viewed in the light most favorable to the United States, supports Julie Crookston's text message that ACI is "what the company"—SCC—"goes by

15

now." *See* ECF No. 88-37. Thus, there is a genuine dispute regarding whether the mere continuation exception applies here.

***

Because the United States has presented evidence that would permit a reasonable fact-finder to conclude that SCC transferred all or substantially all of its assets to ACI and that, at a minimum, the de facto merger and mere continuation exceptions apply, a reasonable fact-finder could likewise determine that ACI is SCC's successor-in-interest and, consequently, liable for SCC's outstanding taxes. Accordingly, the court must deny ACI's motion for summary judgment.

## CONCLUSION AND ORDER

For the foregoing reasons, the court DENIES ACI's motion for summary judgment (ECF No. 83).

DATED August 31, 2022.

BY THE COURT

_____

Jill N. Parrish

United States District Court Judge